Whitehead, J.
INTRODUCTION
This is an action brought under the provisions of G.L.c. 93A, §9 by an individual against an insurance company. The plaintiff, who was injured in a motor vehicle accident caused by the defendant’s insured, alleges unfair claims settlement practices on the part of the defendant. Specifically, he alleges a failure on the part of the insurance company to effect a prompt, fair, and equitable settlement of his claim against the insurer where liability had become reasonably clear, in violation of G.L.c. 176D, §3(9)(f). The case was tried by the court on May 9, 1994 May 10, 1994. The following constitute the Court’s findings of fact, rulings of law and order for judgment.
FINDINGS OF FACT
The plaintiff, Robert O. Yeagle, is an individual who resides in Natick. The defendant, the Aetna Casualty and Surety Company, is a foreign corporation licensed to engage in the business of insurance within the Commonwealth.
On January 28,1988, the plaintiff was the operator of a van which was in line at the Weston toll booths on the Massachusetts Turnpike. Just after the plaintiff had taken his toll ticket, a tractor-trailer owned by C.W. Horse Transportation, Inc. and driven by C.W.’s employee, James Sacco, collided with the rear end of a vehicle operated by James Hendershott. Mr. Hendershott’s vehicle was driven forward by the force of the collision and, in turn, collided with the rear end of the plaintiffs vehicle. The truck had been going at a high rate of speed, and the collision could fairly be described as spectacular in nature.
As a result of the collision, the plaintiff suffered muscle strain in the cervical and lumbarsacral areas, with radiculitis. He also sustained a broken tooth. On the day of the collision, he was treated at the NewtonWellesley Hospital. He received follow-up treatment with at least two physicians and a chiropractor. A union electrician by profession, he missed several weeks of work. It is alleged that he also missed assignments at a part-time job which he held as a special police officer for the Town of Wellesley.
The tractor-trailer truck which precipitated the collision was insured by the defendant, Aetna. Liability coverage for bodily injury to others was in the amount of $1,000,000.00. Aetna received notice of the collision either on the day on which it occurred or on the following day. The case was assigned to claims representative Jerome A. Whitney, III. Within a matter of days, Whitney had conducted an investigation and had concluded that the Aetna’s insured was 100% liable for the collision, a conclusion which was fully warranted on the facts.
The plaintiff retained the services of Attorney Glen Shriberg, of Boston, on a contingent fee basis, for the purpose of handling his claim against Aetna’s insured. The first communication between Whitney and Shriberg took place on February 26, 1988. The two men spoke by telephone and introduced themselves to one another. On the same day, Whitney followed up the call with a letter requesting that Shriberg provide him with medical bills and reports of treatment received by the plaintiff.
Through the balance of the winter and during the spring of 1988, Whitney, on the one hand, and Shriberg, on the other hand, continued to gather information relative to the claim. Shriberg formally filed suit on the plaintiffs behalf in June of 1988. Aetna referred the case to Attorney Brian Finnerty, of Boston, for purposes of defending in court. Discovery ensued.
On October 19, 1988, Whitney wrote to Shriberg seeking an update on the plaintiffs medical status. He also broached for the first time the issue of settlement, stating, “If your client has reached a medical end *202 result, I would be happy to entertain any settlement discussions, as liability appears reasonably clear against our insured.” On December 7, 1988, in apparent response to Whitney’s letter. Shriberg called Whitney and specific settlement figures were discussed. Shriberg demanded $200,000 on behalf of the plaintiff; Whitney offered $10,000 on behalf of its insured. Further discussion was to occur. Indeed, Shriberg had indicated a desire not to settle until after the new year had commenced.
At the time that Whitney made his original offer, the information which he possessed relative to the plaintiffs damages consisted of the following: answers to interrogatories, signed by the plaintiff, which detailed his injuries and treatment, and which indicated medical expenses in the approximate amount of $2,335.00, lost earning capacity as an electrician in the amount of $16,500, and lost earning capacity as a police officer in the amount of $2,760; copies of medical bills in the amount of $629; reports from the plaintiffs treating physicians; and a report from a private investigator indicating that, by July of 1988, the plaintiff appeared to have regained full mobility. Based upon the information which he possessed, Whitney had set Aetna’s reserves on the claim at $20,000.[1]
Shortly before December 7, 1988, Whitney had been promoted to the position of Unit Supervisor. Although he had taken the call from Shriberg and commenced the settlement discussions, primary responsibility for the case had been transferred to claims representative Louis Drouin. Drouin’s evaluation of the plaintiffs claim as of December 1988 is contained in a letter which he wrote to Finnerty on December 17, 1988 (Exhibit #15). Although Shriberg, in his December conversation with Whitney, had asserted special damages in the approximate amount of $30,000 and had also alleged continuing permanent partial disability on the part of the plaintiff, Drouin was skeptical. In his view, the special damages were not sufficiently substantiated. He also believed that an examination of the plaintiff by an Aetna-designated physician was appropriate.
In February 1989, Drouin called Shriberg and informed him that he (Drouin) had taken over the case from Whitney. Shriberg reiterated his position that the plaintiffs special damages were in the range of $25,000-$30,000 and that the plaintiff had suffered permanent neck and shoulder injury. He reiterated his demand of $200,000 Drouin raised Aetna’s offer to $12,000. Shriberg asked Drouin to reevaluate Aetna’s position given the certainty of liability and the asserted amount of special damages.
On February 14, 1989, the plaintiff supplemented his answer to the interrogatory originally put to him concerning monetary loss. In the supplemental answer, he stated his lost wages as an electrician to be in the amount of $19,339.20, plus a loss of union benefits totalling $6,544.32, less worker’s compensation benefits paid of $5,731.00, for a net monetary loss of $20,152.52. He further stated his lost wages as a Wellesley special police officer to be $2,760.00. Finnerty forwarded the new information to Drouin on March 31, 1988. At the same time, he reminded Drouin that Aetna possessed the plaintiffs W-2 forms applicable to his earnings both before and after the accident. He added, however, that neither of the plaintiffs employers had provided wage loss verifications.
On April 12, 1989, Shriberg, on behalf of the plaintiff, sent to Aetna a formal demand letter pursuant to G.L.c. 93A, §9(3), in which he asserted unfair claims settlement practices on the part of Aetna. In the letter, Shriberg claimed that the plaintiffs medical expenses were “far in excess of $2,000.00" and that his diminution of earning capacity was ”in excess of $28,000." He stated that Aetna’s only offer of settlement had been made by Drouin in the amount of $12,000, that Drouin had stated that he would reevaluate the case and get back to Shriberg, and that no reasonable offer of settlement had since been made. On May 9, 1989, Drouin, on behalf of Aetna, sent Shriberg a response which essentially denied that Aetna had been unreasonable.
On May 24, 1989, Shriberg forwarded to Finnerty a wage loss verification form which had been completed by the plaintiffs employer in his capacity as an electrician. Finnerty forwarded the verification to Drouin on June 2, 1989. No verification was obtained from the Town of Wellesley.
On June 13, 1989, the plaintiff was examined by Aetna-designated physician John J. McGillicuddy, M.D. Upon completion of the examination, Dr. McGillicuddy noted that although the plaintiff “still gets some left shoulder pain at times . . . examination is completely normal, and the patient has made an excellent recovery.”
On July 31, 1989, Drouin completed an internal “intermediate regular suit report.” In that report, he expressed the view that investigation and discovery in the case was essentially complete, that the case should be settled, that the outstanding offer of $12,000 had been made in the hope “to use that to negotiate towards a fair settlement” and that the case would be settled when Shriberg and the plaintiff “[came] down to reasonable figures.” Reserves remained at $20,000 for the case, although Drouin appeared to acknowledge total special damages in the amount of $16,000 and general damages amounting to an additional $30,000.
During the fall of 1989, Aetna acquired additional information. On October 23, 1989, in connection with the lawsuit, Finnerty obtained the plaintiffs worker’s compensation file (Exhibit ## 35-36). That file contained complete documentation of the plaintiffs preinjury and post-injury earnings, as well as the nature *203 and treatment of his injuries and the cost of treatment. On November 15, 1989, Shriberg provided Finnerty with supplemental answers to interrogatories, which answers indicated that the plaintiff had received additional treatment from a chiropractor. The cost of the treatment was stated to be an additional $2,360.65. Lastly, on or about December 1, 1989, Finnerty deposed the plaintiff.
Thus, by January of 1990, all of the information that was to be had was in the hands of Aetna. That information reasonably established that the plaintiff had sustained medical expenses of approximately $5,000 and lost wages and benefits as an electrician in the range of $20,000-$24,000. Although the plaintiff claimed an additional loss of $2,760.00 in wages as a special police officer, that loss had not been reasonably documented. Significant past physical pain and suffering had been established. There was evidence of limited ongoing shoulder pain as well.
Against this backdrop, Finnerty wrote to Drouin on January 24, 1990 stating that “[a]n offer in the $20,000-$30,000 range appears reasonable at this time.” In response, on February 12, 1990, Drouin authorized Finnerty to make an offer of $20,000. He also increased Aetna’s reserves to $35,000. On February 15, 1990, Finnerty wrote to Shriberg increasing the offer to $15,000. Shriberg responded by telephone. He rejected the offer and reiterated his demand of $200,000.
On February 21, 1990, a conciliation conference was held in the lawsuit with retired Judge Samuel Flacksman. At the conciliation conference, Shriberg lowered his demand to $125,000. Finnerty raised his offer to $20,000. Judge Flacksman evaluated the case at $70,000. At a final conciliation conference, held on February 28, 1990, Finnerty raised his offer to $30,000. Shriberg stated that he “would recommend” that his client accept $70,000. No agreement was reached. There is no evidence that settlement discussions continued after that.
Trial of the lawsuit took place in June 1990. At the conclusion of the trial, the jury returned a verdict of $75,000. With interest, the final judgment totalled $94,015. The plaintiffs out-of-pocket expenses in connection with the preparation for the trial totalled $3,300.00, consisting of an expert witness fee, the cost of deposition transcripts and the cost of a videotaped deposition that was exhibited to the jury.
The ultimate factual issue for the court to resolve is whether Aetna’s actions, viewed as whole, constituted a failure to effectuate a “prompt, fair and equitable settlement” of the plaintiffs claim, liability having become reasonably clear. In that regard, the parties do not appear to dispute that any discussion of settlement was premature until the time when such discussion actually commenced, in December of 1988. When discussion did commence, Aetna’s offer of $10,000 was a fair response to the plaintiffs initial demand of $200,000. Although the plaintiff, byway of answers to interrogatories, had alleged special damages in the amount of approximately $20,000, those damages were not yet fully substantiated. Moreover, although the physicians’ reports clearly indicated that the plaintiff had suffered injuries, the plaintiffs recoveiy had been excellent. Given the information then available, Aetna’s offer may be viewed as an appropriate opening gambit in response to the plaintiffs initial extremely high demand. Clearly, both parties anticipated a further exchange of information and further discussion.
However, by the time of the conciliation conference in February of 1990, the facts of the claim had crystallized sufficiently that the parties could negotiate earnestly. At that time, it was clear that the plaintiff had suffered special damages in the range of $25,000 to $30,000, that he had experienced a significant degree of past pain and suffering, and that he might also experience some continuing pain and suffering. As of the conclusion of the second conciliation conference, the plaintiff had lowered his demand to $125,000, and Shriberg had stated that he would “recommend” a settlement of $70,000 to his client. The conciliator himself had evaluated the case at $70,000. In light of all these circumstances, Aetna raised its offer to $30,000, but no more.[2]
Whether or not Aetna’s ultimate offer was consistent with an effort to effectuate a “prompt, fair and reasonable settlement” was the subject of sharp disagreement between the experts who testified, respectively, for each party at the instant trial. In the view of Aetna’s expert, Daniel Heaveren, Aetna’s offer was consistent with appropriate settlement practice given the plaintiffs high demand. As Mr. Heaveren saw it, “Aetna and Aetna alone was trying to bring the parties together.” However, in the view of the court, Mr. Heaveren did not take sufficient account of the drastic reduction in the plaintiffs demand from $200,000 to $125,000 that occurred at the first conciliation conference, nor the strong hint, if not an outright declaration, of the plaintiffs willingness to accept $70,000 at the second conciliation conference.
On the other hand, Richard McQuillan, the plaintiffs expert, found Aetna’s offer to be inconsistent with appropriate settlement practice. Mr. McQuillan did not ignore the amount of the plaintiffs demand. However, in determining what should be the appropriate response to the demand, he focused less on the amount of the demand and more on what he perceived to be the real value of the claim. It was his view that by February of 1990, the value of the claim was in the $65,000-$75,000 range and that an offer in that range was warranted.
On balance, the court concludes that Mr. McQuillan’s opinion best takes into account all of the circumstances of the claim as of February 1990. That being so, and based upon the court’s independent *204 assessment of the facts, the court concludes that Aetna’s refusal to offer more than $30,000 from February 28, 1990 until the case was tried to a verdict in June 1990, was inconsistent with an effort to effectuate a “prompt, fair and equitable” settlement of the claim. As of February 1990, the plaintiffs special damages were clearly in the range of $25,000 to $30,000. Drouin had valued general damages at one time as high as $30,000 and at another time no lower than $17,500. Also to be considered was the factor of significant statutory interest. A competent conciliator had valued the total claim at $70,000. Drouin himself had set reserves at $35,000. It was apparent from the actions of the plaintiffs attorney that the plaintiff would likely accept an offer of $70,000. The time for posturing had passed, and the time to make a realistic offer was at hand. Yet, Aetna persisted in making an offer below the $35,000 level of its reserves and well below the apparent real value of the claim.
While it is true that reliance on an attorney’s advice may mitigate what would otherwise be an unfair settlement practice, the evidence does not warrant a finding that Finnerty ever affirmatively advised Aetna not to raise its offer. In fact, there are hints in the correspondence between Finnerty and Drouin that Finnerty viewed the plaintiffs claim as more substantial than Drouin did. In any event, it is clear from the correspondence that Drouin, and not Finnerty, was privy to all relevant information, was making his own independent assessment of the claim and was actually directing the settlement process.
Did Aetna’s unfair settlement practice constitute a willful and knowing violation of G.L.c. 93A, and/or was its refusal to grant relief upon receipt of the plaintiffs demand letter a refusal made in bad faith? The court concludes in the negative. It is clear from the manner in which he set reserves for Aetna’s internal purposes that Drouin’s actions were consistent with his good faith assessment of the value of the case. In the end, he simply undervalued the case. Although his valuation was both wrong and unreasonable, he did not willfully and knowingly violate the law, nor did he act with bad faith.[3]
RULINGS OF LAW
1) General Laws c. 176D, §3(9)(f) defines as an “unfair claim settlement practice,” and hence an “unfair or deceptive act or practice in the business of insurance,” the “failure to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.”
2) General Laws c. 93A, §9(1) creates a right of recovery for “any person whose rights are affected by another person violating the provisions of G.L.c. 176D, §3(9).
3) The court having found as a fact that Aetna has engaged in the failure to effectuate a prompt, fair and equitable settlement of the plaintiffs claim, Aetna has violated G.L.c. 176D, §3(9)(f).
4) As the claimant, the plaintiff has been “affected” by Aetna’s violation and is therefore entitled to recover under G.L.c. 93A, §9(1). The plaintiffs recovery is not contingent upon proof of actual financial loss or other quantifiable financial injury. See generally Leardi v. Brown, 394 Mass. 151 (1985).
5) Given the court’s finding that the violation of G.L.c. 176D, §3(9)(f) was a continuing one from atleast February 28, 1990 until June 1990, the measure of damages to the plaintiff is established by G.L.c. 93A, §9(3) as amended by St. 1989, c. 580, §1, (effective March 5, 1990). Section 9(3), as amended, provides for recovery in the amount of the judgment which the plaintiff ultimately recovered on the claim itself, to wit: $94,015.00.
6) General Laws, c. 93A, §9(3) provides for the multiplication of damages in cases of a willful or knowing violation of G.L.c. 93A, §2 (Section 2 makes unfair or deceptive trade practices unlawful), or where there has been a bad faith refusal to grant relief upon receipt of a written demand.
7) The court having found no willful or knowing violation of G.L.c. 93A, §2 by the defendant, and no bad faith refusal by the defendant to grant relief upon demand, no multiplication of damages is warranted in this case.
8) General Laws c. 93A, §9(4) provides that in cases where the court has found a violation of G.L.c. 93A, §2, (i.e. has found that an unfair or deceptive trade practice has occurred), the plaintiff shall be entitled to an award of reasonable attorneys fees and litigation costs. The plaintiff is entitled to such an award in this case.
ORDER
Based upon the foregoing, the court ORDERS that judgment enter for the plaintiff in the amount of $94,015.00 together with interest, the costs of this litigation and reasonable attorneys fees. A further proceeding shall be held to assess the amount of such costs and fees.

 Subsequently, on December 12, 1988, Whitney also received copies of the plaintiffs W-2 forms for several years preceding the accident.

By this time, Drouin had increased Aetna’s reserves to $35,000. In his internal report, he had raised his valuation of special damages to $17,277 but decreased his valuation of general damages to $17,500.

Moreover, as the Court has already indicated, at the time of the plaintiffs demand letter, Aetna’s outstanding offer of $10,000 was not unreasonable, given the plaintiffs then negotiating posture and the information then available to Aetna.